FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

98 SEP 29 AM 9: 22

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **FREDDIE T. ALLEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO. CV 96-B-325-S** |
| ) | |
| **JEFFERSON COUNTY HEALTH** ) | |
| **DEPARTMENT** ) | |
| ) | |
| **Defendant.** ) | |

ENTERED

SEP 2 9 1998

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment of Defendant Jefferson

County Department of Health ("JCDH") as to all claims of Plaintiff Freddie T. Allen ("Allen").

Upon consideration of the record, the submissions of the parties, and the relevant law, the court is

of the opinion that the defendant's motion for summary judgment is due to be granted.

Allen brings this action against JCDH, alleging that JCDH subjected him to race

discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e *et. seq.,* ("Title VII") and 42 U.S.C. § 1981, and age discrimination in violation of the Age

Discrimination and Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Allen also asserts the

state law claim of intentional infliction of emotional distress/outrage. All of these claims are based

upon his allegedly discriminatory treatment while working with JCDH. For his claims, Allen

seeks compensatory and punitive damages, attorney's fees, interest and costs.

46

## FACTUAL SUMMARY

Allen, an African American male, began working with JCDH as an Accountant Grade 20 in the Birmingham Healthy Start Program in approximately December 1993. (Plaintiff's Second Amended Complaint, ¶ 7). At that time Allen was forty-seven years old. (Deposition of Freddie Allen, hereinafter "Allen Dep.," p. 61). Allen was a probationary employee for the first twelve months of his employment with JCDH, after which time he would have been eligible for consideration as a permanent employee. (First Affidavit of Dr. Carole Samuelson, attached to Def. Mot. Summ. J. as Exhibit 3, hereinafter "Samuelson Aff.," ¶ 3).

The Healthy Start Program is a federally funded program which was designed as a five-year demonstration project with the objective of developing innovative ways to reduce infant mortality. (Affidavit of Odean Charles, attached to Def. Mot. Summ. J. as Exhibit 5 and hereinafter "Charles Aff.," ¶ 5). Both before and during the time that Allen was employed, the Birmingham Healthy Start Project did not meet federal requirements for the program. (*Id.*; Plaintiff's Resp. to Def. Mot. Summ. J., p. 1). As a result, the Division of Healthy Start of the U.S. Department of Health and Human Services placed it on "Exceptional Grantee Status." (*Id.*; Affidavit of Gail Davis attached to Def. Mot. Summ. J. as Exhibit 4, hereinafter "Davis Aff.," ¶ 4). This status meant that the Birmingham Healthy Start Program was only eligible for funds on a six-month basis rather than a yearly basis and that it was in danger of being defunded. (Charles Aff. ¶ 5; Davis Aff. ¶ 4).

Subsequent to being placed on "Exceptional Grantee Status," the program was re-evaluated every six months. (Second Affidavit of Dr. Carole Samuelson, attached to Amendment to Def. Mot. Summ. J. as Exhibit 8, hereinafter "Second Samuelson Aff.," ¶ 3). In these

subsequent evaluations, Gail Davis, the federal Project Officer, who is also an African American, identified Mr. Allen's performance of his accounting duties as an area of concern. (Davis Aff. ¶¶ 2, 3, 5). Ms. Davis determined that Allen had trouble adhering to the federally mandated guidelines and that he did not understand the budgetary requirements of Healthy Start. (Davis Aff. ¶ 5). Also, Davis was concerned that the manner in which Allen proposed to do the healthcare provider contracts provided no safeguard mechanisms to ensure that the grant money was being spent appropriately. (Id.).

Gail Davis and Jeanne Conley, a federal Grants Management Specialist, asked Odean Charles and Dorothy Patterson to participate in all conference calls in which budgetary matters were discussed with Allen, out of concern that Allen did not understand what the federal office asked him to do regarding the budgetary documents. (Davis Aff. ¶ 6; Charles Aff. ¶ 6). Patterson was the Administrator of the Birmingham Healthy Start project, and Charles was the Administrative Assistant assigned to Healthy Start. Both Charles and Patterson are African American females. (Charles Aff. ¶ 2; Affidavit of Dorothy Patterson, attached to Plaintiff's Resp. to Def. Mot. Summ. J. as Exhibit 2, hereinafter "Patterson Aff.," ¶ 2). In addition, to help Allen succeed, Davis arranged for Allen to visit the Oakland Healthy Start Project, a successful project, so that Allen could observe the Fiscal Manager of the Oakland Project and learn proper accounting procedures. (Davis Aff. ¶ 7; Patterson Aff. ¶ 9). However, this trip was canceled after it became apparent that Allen's work performance was so unsatisfactory that it became doubtful that the trip to Oakland would be beneficial. (Second Samuelson Aff. ¶ 2).      Allen's duties included formulation of the Healthy Start budget and making payments to the Healthy Start contractual providers (e.g., Planned Parenthood, Aletheia House, etc.). (Charles Aff. ¶ 7;

3

Patterson Aff. ¶ 3). These providers frequently complained that they had not received payment and that Allen would not respond to their inquiries about when they would be paid. (Charles Aff. ¶ 7). After Charles took over Allen's position, she found that the contractual files for providers did not contain necessary information about whether or not the required services had been provided and whether the providers had been paid. (Charles Aff. ¶ 7).

## A.     Allen's Termination

After two internal audits done by the Health Department in June and September of 1994 revealed serious discrepancies in the budgetary documents and in provider contracts and payments, Mr. Allen refused to acknowledge the problems and either would not or could not correct them. (First Samuelson Aff. ¶ 6). On November 9, 1994, which was approximately eleven months after he was hired, Mr. Allen was served with a Notice to Employee of Contemplated Disciplinary Action which stated as follows:

> You are hereby notified that disciplinary action is contemplated against you for the following reasons: For reasons deemed to be in the best interest of the public service. . . .  More specifically, demonstrated unsatisfactory performance of job duties during the probationary period.
>
> 1.     Inadequate management of financial activities for Healthy Start
>
> 2.     Lack of timely follow through on budgetary activities

(First Samuelson Aff. ¶ 7).

On November 21, 1994, while he was still in his probationary period, Allen received a Notice to Employee of Disciplinary Action which terminated him from his employment with the Health Department as of that date. (*Id.*). Attached to this notice was a copy of Allen's

4

Performance Evaluation which set out several areas of Allen's performance that were below

JCDH's expectations. (*Id.*). Specifically mentioned in this notice was Allen's failure to attend

new employee orientation, his failure to adhere to recommendations made during a June 1994

audit regarding the financial management of Healthy Start, and his failure to present a program to

evaluate the effectiveness of the project's goals and objectives. (*Id.*). The review provides:

> It has been noted at the Federal level from the Grants Management office that
> repeated instructions have to be given to Mr. Allen and often the finished product
> is incorrect.

(*Id.*).

Allen was terminated for poor job performance. (First Samuelson Aff. ¶ 7, Affidavit of

Flora Blackledge, attached to Amendment to Def. Mot. Summ. J. as Exhibit 9, hereinafter

"Blackledge Aff.," ¶ 1). Flora Blackledge is a forty-nine year old African American female who

served as Director of Home Health and Hospice for JCDH. (*Id.*) This termination was performed

in a manner consistent with the procedure required for the termination of probationary employees.

(First Samuelson Aff. ¶ 5). After two audits revealed serious uncorrected deficiencies in his

work, Allen received the above-mentioned notices and was given a due process hearing. (First

Samuelson Aff. ¶ 6).

No one preceded Mr. Allen in his position as an accountant with the Health Department

for the Birmingham Healthy Start Program. (First Samuelson Aff. ¶ 4). Upon his termination,

Odean Charles, an African American female, took over the duties that had previously been

assigned to Allen. (First Samuelson Aff. ¶ 13; Charles Aff. ¶ 4). At the time she took over

Allen's duties, Odean Charles was fifty years old. (Charles Aff. ¶ 4).

5

## B.    Reclassification of Employment Position

Under the Enabling Act and the Rules & Regulations of the Jefferson County Personnel Board, a job audit is a means by which the classification of an employee's position can be reviewed. (First Samuelson Aff. ¶ 8). Certain county employees can request an audit of their positions to ensure proper classification. *(Id.)*. In addition to an on-site observation by a Personnel Board employee, the employee whose position is being audited also completes a position description questionnaire ("PDQ") to list his primary job duties and responsibilities. *(Id.)*. The PDQ is then reviewed by the Personnel Board staff as part of its classification recommendation. *(Id.)*. In performing job audits and creating job classifications, the Personnel Board classifies positions based on the duties performed. *(Id.)*. The Board does not classify individuals. *(Id.)*.

Allen felt that his duties entitled him to a job classification higher than Accountant Grade 20. Allen's opinion that he should be promoted was shared by Dorothy Patterson, who was the Birmingham Healthy Start Administrator. (Patterson Aff. ¶ 9). In approximately July 1994, Allen requested that his position as an accountant be reclassified. (Allen Dep., pp. 109-111; First Samuelson Aff. ¶ 9). This request was forwarded to the Personnel Board of Jefferson County for review. (First Samuelson Aff. ¶ 9). The Board staff conducted an on-site audit of the position and received and reviewed the Position Description Questionnaire ("PDQ") completed by Allen. (Allen Dep., at p. 120; First Samuelson Aff. ¶ 9).

On November 8, 1994, the Personnel Board concluded that Allen's request to create a new classification of Fiscal Manager at G-27-7 was unwarranted. (First Samuelson Aff. ¶ 10). The Board recommended that the position be reclassified to Senior Accountant at G-23-7 (Grade

6

23). *(Id.).* This recommendation was put on hold because at the time this decision was reached, Allen had been identified as a problem by the federal office and by Health Department audits. (First Samuelson Aff. ¶ 11). The reclassification was rendered moot by Allen's termination. *(Id.).*

### C.   Allen's Testimony Regarding his Job Performance and Termination.

Allen maintains that he was first discriminated against by JCDH on November 9, 1994, when Flora Blackledge brought him the Notice of Contemplated Disciplinary Action. (Allen Dep. p. 96). Allen said he was surprised because he felt that he had been doing a good job based on the fact that he had received satisfactory evaluations up to that time. (Allen Dep., pp. 96). Allen supports this assertion with the affidavit testimony of Dorothy Patterson, the Birmingham Healthy Start Administrator, who states that she was satisfied with Allen's job performance as of September 1994. However, neither Allen nor several other Birmingham Healthy Start employees received the periodic evaluation required by Health Department regulations. (Charles Aff. ¶ 8; Blackledge Aff. ¶ 1). According to Charles, Patterson refused to do the evaluations. (Charles Aff. ¶ 6). Charles also states that in response to continuing requests for the delinquent evaluations, Patterson insisted that there were too many delinquent evaluations to complete. *(Id.).* Finally, Odean Charles testified that she completed all the overdue evaluation forms simply by marking the column "meets expectations" for each employee's performance in all categories. *(Id.).*

Allen testified that the Notice of Contemplated Disciplinary Action which he received on November 9, 1994 was his first notice that anyone thought his job performance was unsatisfactory. (Allen Dep. pp. 121-22). Allen also testified that he had a dispute with Marlene Furgerson, the Health Department's Auditor, regarding her audit reports of his work. (Allen Dep.,

7

pp. 122-24). Allen maintained that Furgerson did not understand the federal guidelines, that he did understand the federal guidelines and followed them, and that he did not receive nor did he need any assistance from Odean Charles. (Allen Dep., pp. 171-72, 186-87).

Allen admitted that Gail Davis told the entire Birmingham Healthy Start program in March of 1994 that the program was approved for only six more months and that changes had to be made in how the program was operated; however, Allen denied that anyone with the federal Healthy Start program had ever criticized his work. (Allen Dep., pp. 122, 124-26). Allen testified that he had several meetings with Flora Blackledge and Marlene Furgerson regarding the deficiencies revealed in the internal audit reports. He testified that Blackledge and Furgerson were not critical of his work in these meetings, but rather that they were having the meetings only to determine how the problem could be solved. (Allen Dep., pp. 123-24).

No JCDH employee or representative ever told Allen that he was terminated because of his age or race:

> Q.    Did anybody ever tell you in any way that anything
>       that happened to you was because you were black?
>       For example, did somebody say to you you were
>       terminated because you were black or Flo
>       Blackledge told me you terminated because you
>       were black? Did you ever hear anything like that?
>
> A.    No.
>
> Q.    The same for age? Did you ever hear personally or
>       did anybody else ever tell you this gentleman was
>       terminated because he was over forty?
>
> A.    No.

(Allen Dep., pp. 140-41). Mr. Allen has no documents to support his claim that he was not

8

promoted or that he was fired because he was black:

> Q. Number 10, I asked you this earlier, but you don't have a document that says on there anywhere, do you, that you were not promoted or not -- or fired because you were black?
>
> A. No one told me that.
>
> Q. Or have you seen a document that says that?
>
> A. Well, no, I didn't see a document that said that, no.

(Allen Dep., p. 143).

Allen testified that he believes that he was discriminated against because he was the only black accountant in the Jefferson County Health Department System in an administrative position. Allen testified that Dr. Samuelson is the only person who discriminated against him because she is the person who terminated him.  (Allen Dep., p. 225).  Allen also believes that Dr. Samuelson blocked his reclassification to a higher grade because of his race and age.  (Allen Dep., p. 141). However, JCDH has presented evidence that at the time that Allen was employed, of the 528 Health Department employees who were Grade 20 or higher, 199 African Americans working at JCDH were at positions of Grade 20 or higher and 417 employees aged forty or older were classified at Grade 20 or higher.  (First Samuelson Aff. ¶ 2).  Of the 305  JCDH employees at Grade 23 or higher, ninety-eight were African American, and 251 were forty years of age or older.  (*Id.*).  Two of the people who have testified in this case are African Americans in administrative positions, Odean Charles and Flora Blackledge.  (Charles Aff. ¶ 1;  Allen Dep., p. 141).

Allen also claims that his duties were assumed by a white employee, Brenda Abbott, who was hired by JCDH as an accountant in October 1994.  (Plaintiff's Response to Def. Mot. Summ.

9

J., p. 7). Allen's only argument in support of this allegation is that Abbott was also hired as an Accountant Grade 20. (*Id.*). However, JCDH has presented sworn testimony that Abbott did not replace Allen nor did she assume any of his duties. (Affidavit of Neil Michaelson, attached to Amendment to Def. Mot. Summ. J. as Exhibit 10, ¶ 3). Rather, Abbott was hired on October 10, 1994, prior to the termination of Allen, to replace Sylvia Freeman, a former JCDH accountant who was terminated in August 1993. (*Id.*).

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; see FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial, . . . '" *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

10

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman.* 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for Allen. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighting of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## I.    RACE DISCRIMINATION CLAIMS

Allen claims that he was subjected to unlawful discrimination on the basis of his race in three ways. First, Allen alleges that he was terminated from his employment with the Healthy Start Program because he is an African American. Second, he claims that he was denied job reclassification and promotion because of his race. Finally, he asserts that he was subjected to a hostile work environment based on his race. Each of these claims are discussed below.

A plaintiff alleging illegal discrimination under Title VII may establish a genuine dispute as to his claim in three ways: 1) by presenting direct evidence of discriminatory intent, *see Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir. 1998) (direct evidence defined as "evidence, which if believed, proves existence of fact in issue without inference or presumption"); 2) by meeting the three-step test set forth in *McDonnell Douglas Corp. v.*

11

*Green*, 411 U.S. 792 (1973); or 3) by demonstrating through statistics a pattern of discrimination,

*See Carter, supra,* at 642 n.5 (citing *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126,

1131 (11th Cir. 1984). Allen has presented no direct or statistical evidence to support his claim

that JCDH discriminated against him based on his race. Therefore, the court will analyze Allen's

race discrimination claims under the three-step analysis outlined in *McDonnell Douglas, supra.*

Under the *McDonnell Douglas* framework, the plaintiff first "must establish a prima facie

case of discrimination. The employer then must respond with a legitimate, nondiscriminatory

reason for its actions. In order to prevail, the plaintiff must establish that the employer's

articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination."

*Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998), (citing *Walker v.*

*NationsBank of Fla. N.A.* 53 F.3d 1548, 1556 (11th Cir. 1995)). Despite the burden shifts in the

*McDonnell Douglas* test, "the ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept.*

*of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Evans v. McClain of*

*Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997).

> a.   **Discriminatory Discharge**

In order to establish a *prima facie* case of discriminatory discharge on the basis of race,

Allen must prove: 1) he was a member of a protected class; 2) he was qualified for the job; 3) he

was terminated despite his qualifications; and 4) his former position remained open after his

termination and the employer continued to seek similarly qualified applicants. *Evans v. McClain*

*of Georgia, Inc.*, 131 F.3d 957, 964 (11th Cir. 1997).

12

Allen has failed to meet his prima facie burden of showing that he was discriminatorily discharged. It is undisputed that Allen established the first three elements of his prima facie case. However, Allen has presented neither evidence that his position remained open nor that JCDH sought to hire a similarly qualified person to replace him. Although Allen alleges that his duties were assumed by a white employee, he has produced no evidence to support this claim. (Plaintiff's Response to Def. Mot. Summ. J., p. 7). In contrast, JCDH has presented sworn testimony that Allen's duties in the Healthy Start Program were assumed by Odean Charles, a fifty year-old African-American female. (First Samuelson Aff. ¶ 4; Charles Aff. ¶ 4). Allen challenges this testimony with Dorothy Patterson's affidavit testimony that Odean Charles "had no experience that would require her to have an understanding of federal guidelines in working with a multi-million-dollar budget." (Patterson Aff. ¶ 7). However, this testimony concerns only Charles's qualification for the tasks assigned to her; it does not question the sworn testimony of Carole Samuelson and Odean Charles that Charles assumed Allen's duties upon his termination.

Even if the court did find that Allen had made the required prima facie showing, JCDH has presented sufficient evidence of a legitimate, nondiscriminatory reason for its decision to terminate Allen: his poor job performance. Unsatisfactory job performance has been repeatedly held to be a legitimate, nondiscriminatory reason for terminating an employee. *See, e.g., Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (11th Cir. 1996); *Woodbury v. Sears Roebuck & Co.*, 901 F.Supp. 1560, 1564 (M.D.Fla. 1995). Therefore, the court finds that JCDH has met its burden under the second prong of the *McDonnell Douglas* test.

Allen has failed to present sufficient evidence to create a genuine issue of material fact with respect to the nondiscriminatory reasons offered by JCDH. Allen asserts that his job

13

performance was satisfactory and states his suspicion that his termination was motivated by illegal discrimination. Allen also offers Dorothy Patterson's testimony that she was satisfied with his job performance. (Patterson Aff. ¶ 10). However, this evidence is insufficient to create a material dispute as to the pretextual nature of the proffered reason. Patterson's positive assessment of Allen's job performance is not representative of the opinions of the other JCDH employees who have testified in this case and cannot be said to represent the official stance of JCDH with respect to Allen's job efficacy. More importantly, however, is that the fate of the Birmingham Healthy Start Program was controlled by federal officials, such as Gail Davis. Davis has testified that one of the problems that the U.S. Department of Health and Services identified at Birmingham Healthy Start was Allen's inability to understand the budgetary documents and to successfully perform his accounting duties. (Davis Aff. ¶¶ 3,4). Therefore, Allen has failed to demonstrate a disputed issue of material fact and the defendant is due summary judgment on Allen's discriminatory discharge claim.

### b.   Failure to Promote/Reclassify Position

Allen further asserts that JCDH discriminated against him by refusing to reclassify his position to a higher grade within the department. In order to demonstrate a prima facie case for discriminatory failure to promote, a plaintiff must show that: 1) he is a member of a protected class; 2) he was qualified for and applied for the promotion; 3) he was rejected in spite of his qualifications; and 4) the individual who received the promotion is not in a protected group and had lesser or equal qualifications. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998).

14

It is unclear whether this circuit would apply the failure-to-promote framework given above to the factual situation presented here, where an employee sought to have his position reclassified or upgraded.[1] In this situation, no other employee is promoted in lieu of the plaintiff. Therefore, Allen would be unable to meet the fourth requirement of the prima facie showing, that a nonprotected individual received the promotion sought by Allen.

However, the court is not required to reach this issue. Even if Allen has made a prima facie showing on his failure-to-reclassify claim, JCDH has provided an uncontroverted reason for its decision to deny Allen the reclassification which he sought. Specifically, the Jefferson County Personnel Board's decision to deny Allen's request for Grade 27 Fiscal Manager status was based on its independent, on-site audit of Allen's functions and duties. (First Samuelson Aff. ¶ 8). Upon completing this audit, the Personnel Board determined that Allen's requested reclassification for Grade 27 Fiscal Manager status was unwarranted. (First Samuelson Aff. ¶ 10). However, the Personnel Board did find that Allen's position should be reclassified to Senior Accountant at Grade 23. (*Id.*). This reclassification was never instituted because of the negative reports concerning Allen's work performance. (First Samuelson Aff. ¶ 11).

Allen counters this legitimate reason offered by JCDH only by stating that he believes that Carole Samuelson, who terminated him, also blocked his requested reclassification because of his race and age. (Allen Dep. p. 141). This allegation alone is insufficient to create a genuine dispute

---

[1] At least one district court utilized the failure-to-promote prima facie test in analyzing a plaintiff's claim that his position was not upgraded because of the his race. *See Hair v. Helena Chemical Co.*, 732 F.Supp. 1515, 1517-18 (E.D.Ark. 1990), *affirmed* 915 F.2d 1579 (8th Cir. 1991). However, the test employed by the district court in *Hair* did not require that the position be filled by a member of a nonprotected class. Rather, the plaintiff was merely required to demonstrate that he was "rejected under circumstances which allow the Court to infer unlawful discrimination." *Id.* at 1518.

15

as to the validity of the nondiscriminatory reason offered by defendant for the denial of reclassification. Therefore, JCDH is entitled to summary judgment on Allen's discriminatory failure to promote claim.

### c.    Hostile Work Environment

Allen claims that he was subjected to a hostile work environment while employed by JCDH because of his race. Hostile work environment racial harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). The conduct at issue must be sufficiently severe or pervasive to create an "objectively hostile or abusive work environment" to be actionable under Title VII. *Harris,* 510 U.S. at 21-22; *see also Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (the harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment"). Thus, the "mere utterance" of a remark that engenders offense does not affect the terms, conditions, or privileges of employment to a sufficient degree to violate Title VII. *Henson,* 682 F.2d at 904. In addition, whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, and whether the conduct unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23; *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

To establish a prima facie case of hostile work environment based on race, Allen must prove four elements: 1) that he belongs to a protected group; 2) that he was subject to

16

unwelcome harassment; 3) that the harassment complained of was based on race; and 4) the harassment complained of affected a term, condition, or privilege of employment. *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982).

Allen has offered no evidence to show that he was subject to unwelcome racial harassment that affected a term condition or privilege of employment. Allen fails to identify a single incident of overtly racist behavior exhibited by any JCDH employee. Also, there is no evidence that Allen was treated differently than other similarly situated non-black employees. Allen has completely failed to reveal harassment so pervasive and severe as to affect the terms, conditions, or privileges of his employment. Therefore, JCDH is due summary judgment on Allen's racial harassment claim.

## II.     AGE DISCRIMINATION CLAIMS

As with his race discrimination claims, Allen has provided neither direct nor statistical evidence of intentional age discrimination by JCDH. Therefore, the court will again analyze the circumstantial evidence of age discrimination presented by Allen under the three-step *McDonnell Douglas* analysis. *See Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

### a.     Discriminatory Discharge

The ADEA prohibits an employer from discharging or otherwise discriminating against an employee on the basis of age. 29 U.S.C. § 621, *et seq.*. The protections of the ADEA are limited to persons over the age of 40. 29 U.S.C. § 631. Because Allen was forty-eight (48) years old when the challenged employment decision was made, he falls within the class protected by the ADEA.

17

In an ADEA case involving alleged wrongful discharge, a plaintiff may establish a prima facie case of discrimination by showing: 1) that he was a member of the class protected by the statute; 2) that he was subject to adverse employment action; 3) that a substantially younger person filled the position from which he was discharged; and 4) that he was qualified to do the job from which she was discharged. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)).

Allen has failed to prove the third element of this prima facie showing. Allen was not replaced by someone substantially younger than himself. Allen's duties with the Healthy Start Program were assumed by Odean Charles, who was fifty years old at the time that Allen was terminated, two years older than Allen. (Charles Aff. ¶ 4).

Assuming, however, that Allen has demonstrated a prima facie case of age discrimination based on his termination, his unsatisfactory job performance provided JCDH with a legitimate, nondiscriminatory reason for their challenged employment decision. Allen has not rebutted this reason with any evidence that reveals this reason as a pretext. As Allen has failed to present a prima facie case for wrongful termination under the ADEA and has not provided sufficient evidence that JCDH's nondiscriminatory reason for his termination was pretextual, JCDH is due summary judgment on this claim.

**b.      Failure to Promote/Reclassify Position**

Allen's claim that his position was not reclassified because of his age is unsupported by the evidence presented in this case. As stated above, Allen's request for reclassification was evaluated by the Personnel Board, which found that Allen's duties and responsibilities did not require reclassification to the grade he sought. Allen was not thereafter reclassified to Grade 23

18

because his poor job performance required his termination. Allen has failed to present any evidence to create a genuine dispute as to the veracity of this proffered explanation. Accordingly, JCDH is due summary judgment on this claim.

### c.    Hostile Work Environment

Allen asserts that he was subjected to a hostile work environment at JCDH because of his age. A hostile work environment claim under the ADEA has not been expressly recognized by the Eleventh Circuit.[2] In *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830 (6th Cir. 1996), the Sixth Circuit became the only circuit court of appeals to recognize this claim. In *Crawford*, the court established a four-part test that a plaintiff must meet in order to establish a prima facie case of hostile work environment under the ADEA: 1) the employee is forty years or older; 2) the employee was subjected to harassment, either through words or actions based on age; 3) the harassment had the effect of unreasonably interfering with the employee's work performance in creating an objectively intimidating, hostile, or offensive work environment; 4) there exists some basis for liability on the part of the employer. *Id.* at 834-35.

Assuming that hostile work environment age discrimination is actionable in this circuit, Allen has failed to present any evidence of a hostile environment at JCDH based on his age, race or any other characteristic. As stated above, Allen has not identified a single incident of harassing or hostile behavior exhibited by any employee of JCDH. Accordingly, the defendant is entitled to

---

[2]The Eleventh Circuit Court of Appeals recently affirmed a district court's denial of a defendant/employer's motion for summary judgment on a hostile environment age discrimination claim. *See U.S. E.E.O.C. v. Massey Yardley Chrysler, Plymouth*, 117 F.3d 1244 (11th Cir. 1997). However, the Court refused to rule on the validity of this claim under the ADEA, stating that: "[n]either party questions, hence we do not actually decide, whether the hostile environment doctrine developed in Title VII actions applies in an ADEA action, . . ." *Id.* at 1249 n.1.

summary judgment on this claim.

## III.   SECTION 1981 CLAIMS

Allen alleges that the above-described actions of JCDH with respect to the status and conditions of his employment violated his civil rights under 42 U.S.C. § 1981. The protections of § 1981 in the employment context considerably overlap those provided in Title VII. *Grier v. Partek Industries, Inc.*, 903 F.Supp. 1480, 1491 (M.D.Ala. 1995). Furthermore, "the test for intentional discrimination in suits under § 1981 is the same as the framework used in Title VII discriminatory treatment cases." *Id.* Because, as the *Grier* court noted, these statutes are "inextricably intertwined," the court will not conduct an independent analysis of Allen's claims under § 1981 as Allen is unable to meet his burden of proving intentional discrimination under Title VII. *Id.*

## IV.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/ OUTRAGE

Allen alleges that JCDH's failure to reclassify his position, the hostile work environment at JCDH and his ultimate termination constitute intentional infliction of emotional distress and outrage. To recover under the tort of intentional infliction of emotional distress, or outrage, in Alabama, a plaintiff must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Peterson v. BMI Refractories*, 132 F.3d 1405, 1413 (11th Cir. 1998); *Jenkins v. U.S. Fidelity & Guar. Co.*, 698 So.2d 765, 768 (Ala. 1997) (citing *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). To satisfy the second prong, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

20

civilized society." *Inmon, supra*, at 365 (quoting Restatement (Second) of Torts § 46 at 72 (1948)) (summary judgment for defendant employer where plaintiff proved he was "harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily, and terminated without justification."); *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir.1996), *reh'g denied* 105 F.3d 673 (1996).

The Alabama Supreme Court has consistently held that outrage is "an action difficult of proof and one for which recovery may be had only upon meeting all of the elements of the stringent standard" set by *Inmon*. *K.S. v. Carr*, 618 So.2d 707 (Ala. 1993) (finding that an adoption agency's refusal to release child to natural mother until she assumed responsibility for the medical bills was not outrageous). During the seventeen years since *Inmon* was decided, every case in which the Alabama Supreme Court has found that a jury question existed on an outrage claim can be placed into one of three categories: (1) family funerals or burials; (2) persistent and egregious sexual harassment as in *Busby v. Truswal Systems Corp.*, 551 So.2d 322 (Ala. 1989); or (3) an insurance company's brazen attempts to coerce settlement. *See Durham v. Philippou*, 968 F.Supp. 648, 659 (M.D.Ala. 1997) (citing *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041 (Ala. 1993). A federal court applying Alabama law found that an outrage claim was stated by a plaintiff in a case where the defendants had placed him on death row before he had been tried, convicted, or sentenced for a crime as a means of coercing false testimony or confessions from him. *McMillian v. Johnson*, 878 F.Supp. 1473, 1541, *aff'd in part, vacated in part, rev'd in part*, 88 F.3d 1554, *opinion amended on reh'g* 101 F.3d 1363, *aff'd* 520 U.S. ___, 117 S.Ct. 1734 (1997).

The actions of JCDH towards Allen were not outrageous. With respect to reclassification of Allen's position, the defendant followed the guidelines set forth in the Rules & Regulations of the Jefferson County Personnel Board. Also, JCDH was legally entitled to terminate Allen, a probationary employee, for poor job performance. Furthermore, Allen's termination proceedings were no different than the termination of any other probationary employee. (First Samuelson Aff. ¶ 5 ). Allen claims that the defendant should have done more to ensure the program's success; however, there is nothing in Allen's allegations which can be considered extreme or outrageous conduct by JCDH. To the contrary, the evidence is undisputed that extensive efforts were made both by federal officials and by the Health Department to assist and save the Birmingham Healthy Start Program and to help Allen succeed. (Davis Aff. ¶¶ 6-8). In light of the foregoing, the court concludes that Allen has failed to present substantial evidence of "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." *Inmon, supra,* at 365. Therefore, the defendant is due summary judgment on Allen's intentional infliction of emotional distress/outrage claim.

## CONCLUSION

The plaintiff's evidence raises no genuine issues of material fact regarding his claims of race and age discrimination and intentional infliction of emotional distress/outrage. Accordingly, the defendant's motion for summary judgment with respect to these claims is due to be granted.

22

An order granting the defendant's motion for summary judgment will be entered

contemporaneously herewith.

DONE this 29th day of September, 1998.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

23